1
2
3
4
5
6
7

8                    **UNITED STATES DISTRICT COURT**

9                    **CENTRAL DISTRICT OF CALIFORNIA**

10

11  ALISA ANN A.,[1]                ) Case No. CV 19-1066-JPR
                                    )
12                 Plaintiff,       )
                                    ) MEMORANDUM DECISION AND ORDER
13          v.                      ) REVERSING COMMISSIONER
                                    )
14  ANDREW SAUL, Commissioner       )
    of Social Security,             )
15                                  )
                   Defendant.       )
16                                  )
                                    )
17  _____)

18  **I.   PROCEEDINGS**

19       Plaintiff seeks review of the Commissioner's final decision

20  denying her application for Social Security supplemental security

21  income benefits ("SSI").  The parties consented to the

22  jurisdiction of the undersigned under 28 U.S.C. § 636(c).  The

23  matter is before the Court on the parties' Joint Submission,

24  filed December 4, 2019, which the Court has taken under

25

26       _____

27       [1] Plaintiff's name is partially redacted in line with
    Federal Rule of Civil Procedure 5.2(c)(2)(B) and the
28  recommendation of the Committee on Court Administration and Case
    Management of the Judicial Conference of the United States.

                                    1

submission without oral argument.  For the reasons stated below, the Commissioner's decision is reversed and this matter is remanded for further proceedings.

## II.   BACKGROUND

Plaintiff was born in 1972.  (Administrative Record ("AR") 221.)  She completed high school in juvenile hall.  (AR 243, 363.)  She never worked regularly.  (AR 257-60.)  On September 30, 2015, she applied for SSI, alleging that she had been unable to work since January 1, 1986, because of bipolar disorder, depression, and schizophrenia.[2]  (AR 115, 242.)  After Plaintiff's application and reconsideration of it were denied (AR 145-46, 154-55), she requested a hearing before an Administrative Law Judge (AR 161-63).  A hearing was held on August 25, 2017, at which Plaintiff, represented by counsel, testified, as did a vocational expert.  (AR 32-89.)  In a written decision issued December 8, 2017, the ALJ determined that she was not disabled.  (AR 12-25.)  On December 11, 2018, the Appeals Council denied her request for review.  (AR 1-3.)  This action followed.

## III.  STANDARD OF REVIEW

Under 42 U.S.C. § 405(g), a district court may review the Commissioner's decision to deny benefits.  The ALJ's findings and decision should be upheld if they are free of legal error and supported by substantial evidence based on the record as a whole.

---

[2] Plaintiff applied for Social Security benefits in 2012 (see AR 93); her claim was denied by an Administrative Law Judge on February 27, 2014.  (AR 90-103.)  The ALJ here found that Plaintiff had rebutted the presumption of continuing nondisability, see Chavez v. Bowen, 844 F.2d 691, 693 (9th Cir. 1988), because the regulations "for evaluating mental disorders" had changed since the prior decision.  (AR 18.)

2

1   See Richardson v. Perales, 402 U.S. 389, 401 (1971); Parra v.

2   Astrue, 481 F.3d 742, 746 (9th Cir. 2007).  Substantial evidence

3   means such evidence as a reasonable person might accept as

4   adequate to support a conclusion.  Richardson, 402 U.S. at 401;

5   Lingenfelter v. Astrue, 504 F.3d 1028, 1035 (9th Cir. 2007).  It

6   is "more than a mere scintilla but less than a preponderance."

7   Lingenfelter, 504 F.3d at 1035 (citing Robbins v. Soc. Sec.

8   Admin., 466 F.3d 880, 882 (9th Cir. 2006)).  "[W]hatever the

9   meaning of 'substantial' in other contexts, the threshold for

10   such evidentiary sufficiency is not high."  Biestek v. Berryhill,

11   139 S. Ct. 1148, 1154 (2019).  To determine whether substantial

12   evidence supports a finding, the reviewing court "must review the

13   administrative record as a whole, weighing both the evidence that

14   supports and the evidence that detracts from the Commissioner's

15   conclusion."  Reddick v. Chater, 157 F.3d 715, 720 (9th Cir.

16   1998).  "If the evidence can reasonably support either affirming

17   or reversing," the reviewing court "may not substitute its

18   judgment" for the Commissioner's.  Id. at 720-21.

19   **IV.   THE EVALUATION OF DISABILITY**

20       People are "disabled" for purposes of receiving Social

21   Security benefits if they are unable to engage in any substantial

22   gainful activity owing to a physical or mental impairment that is

23   expected to result in death or has lasted, or is expected to

24   last, for a continuous period of at least 12 months.  42 U.S.C.

25   § 423(d)(1)(A); Drouin v. Sullivan, 966 F.2d 1255, 1257 (9th Cir.

26   1992).

27       A.   The Five-Step Evaluation Process

28       An ALJ follows a five-step sequential evaluation process to

3

1  assess whether someone is disabled.  20 C.F.R. § 416.920(a)(4);

2  Lester v. Chater, 81 F.3d 821, 828 n.5 (9th Cir. 1995) (as

3  amended Apr. 9, 1996).  In the first step, the Commissioner must

4  determine whether the claimant is currently engaged in

5  substantial gainful activity; if so, the claimant is not disabled

6  and the claim must be denied.  § 416.920(a)(4)(i).

7      If the claimant is not engaged in substantial gainful

8  activity, the second step requires the Commissioner to determine

9  whether the claimant has a "severe" impairment or combination of

10 impairments significantly limiting her ability to do basic work

11 activities; if not, a finding of not disabled is made and the

12 claim must be denied.  § 416.920(a)(4)(ii) & (c).

13     If the claimant has a "severe" impairment or combination of

14 impairments, the third step requires the Commissioner to

15 determine whether the impairment or combination of impairments

16 meets or equals an impairment in the Listing of Impairments

17 ("Listing") set forth at 20 C.F.R., part 404, subpart P, appendix

18 1; if so, disability is conclusively presumed and benefits are

19 awarded.  § 416.920(a)(4)(iii) & (d).

20     If the claimant's impairment or combination of impairments

21 does not meet or equal one in the Listing, the fourth step

22 requires the Commissioner to determine whether the claimant has

23 sufficient residual functional capacity ("RFC")[3] to perform her

24

25     [3] RFC is what a claimant can do despite existing exertional
26 and nonexertional limitations.  § 416.945(a)(1); see Cooper v.
   Sullivan, 880 F.2d 1152, 1155 n.5 (9th Cir. 1989).  The
27 Commissioner assesses the claimant's RFC between steps three and
   four.  Laborin v. Berryhill, 867 F.3d 1151, 1153 (9th Cir. 2017)
28                                                    (continued...)

4

past work; if so, she is not disabled and the claim must be denied.  § 416.920(a)(4)(iv).  The claimant has the burden of proving she is unable to perform past relevant work.  Drouin, 966 F.2d at 1257.  If the claimant meets that burden, a prima facie case of disability is established.  Id.

If that happens or if the claimant has no past relevant work, the Commissioner bears the burden of establishing that the claimant is not disabled because she can perform other substantial gainful work available in the national economy, the fifth and final step of the sequential analysis. §§ 416.920(a)(4)(v), 416.960(b).

B.   The ALJ's Application of the Five-Step Process

At step one, the ALJ found that Plaintiff had not engaged in substantial gainful activity since September 30, 2015, the application date.  (AR 18.)  At step two, he determined that she had the severe impairments of "bipolar affective disorder; personality disorder; [and] mood disorder."  (Id.)

At step three, he concluded that Plaintiff's impairments did not meet or equal any of the impairments in the Listing.  (AR 19-20.)  At step four, he found that Plaintiff had the RFC to perform

> a full range of work at all exertional levels but with
> the following nonexertional limitations.  She: is able to
> perform work consisting of simple, 1-2 step tasks at
> reasoning level 1; can have no public contact; and can

---

[3] (...continued)
(citing § 416.920(a)(4)).

1   have occasional contact with supervisors and coworkers.
2   (AR 20.)  Because Plaintiff had no past relevant work, the ALJ
3   continued to step five.  (AR 23.)

4       At that step, considering Plaintiff's age, education, work
5   experience, RFC, and the VE's testimony, he found that Plaintiff
6   could perform several jobs existing in significant numbers in the
7   national economy.  (AR 23-24.)  Accordingly, he found her not
8   disabled.  (Id.)

9   **V.   DISCUSSION**[4]

10      Plaintiff contends that the ALJ erred in assessing her RFC
11  and in evaluating her subjective symptom statements.  (J. Stip.
12  at 3-6, 8-12, 16-17.)  For the reasons discussed below, reversal
13  is necessary.

14      A.   The ALJ Erred in Assessing Plaintiff's RFC

15      Plaintiff argues that the ALJ improperly relied on the
16  opinions of consulting psychiatrist Stephen Simonian and state-
17  agency psychological consultant Ralph Mertens, "cherry-pick[ing]"
18  from their opinions without explanation to reach a conclusion
19  that had "no basis in the record."  (Id. at 3-4.)  She also
20  contends that the ALJ failed to include her limitations in

21  _____

22      [4] In Lucia v. SEC, 138 S. Ct. 2044, 2055 (2018), the Supreme
    Court held that ALJs of the Securities and Exchange Commission
23  are "Officers of the United States" and thus subject to the
    Appointments Clause.  To the extent Lucia applies to Social
24  Security ALJs, Plaintiff has forfeited the issue by failing to
    raise it during her administrative proceedings.  (See AR 32-52,
25  319-19); Meanel v. Apfel, 172 F.3d 1111, 1115 (9th Cir. 1999) (as
    amended) (plaintiff forfeits issues not raised before ALJ or
26  Appeals Council); see also Kabani & Co. v. SEC, 733 F. App'x 918,
    919 (9th Cir. 2018) (rejecting Lucia challenge because plaintiff
27  did not raise it during administrative proceedings), cert.
    denied, 139 S. Ct. 2013 (2019).
28

1  maintaining concentration, persistence, and pace in his

2  hypothetical to the VE.  (Id. at 4.)

3       As explained below, the ALJ failed to explain why, despite

4  giving "great weight" to Dr. Simonian's opinion, he did not

5  incorporate the doctor's finding of marked limitation in social

6  interaction with coworkers and supervisors into Plaintiff's RFC

7  but credited that same finding as to the public by barring her

8  from any contact with them.  Nor did the ALJ reconcile the

9  inconsistencies between Dr. Simonian's opinion and that of Dr.

10  Jacob Tendler,[5] both of which he gave "great weight."

11            1.   Relevant background

12            a.   *Plaintiff's treating doctors*

13       Plaintiff was treated on and off from September 12, 2011,

14  through May 21, 2014, at a mental-health clinic.  (AR 320-54.)

15  Her initial assessment describes her chief complaints as

16  "insomnia, anxiety, . . . irritab[ility], cutting from age 12,

17  burning self with cigarettes, moody, angry, sad, frustrated,

18  needy, hates to be alone, no purpose — does not know what she is

19  here for, borderline . . . self-[destructive], but now wants to

20  try and take medication."  (AR 320.)  She reported having

21  antisocial personality disorder and said she did not like to take

22  medication.  (Id.)  As for psychiatric history, she claimed that

23  on Halloween 2010, she cut herself with a knife because she was

24  angry.  (Id.)  She also reported a suicide attempt in 1992, in

25

26       [5] Dr. Tendler appears to specialize in psychiatry because
   his electronic signature includes a specialty code of 37.  (See
27  AR 134); Soc. Sec. Admin., Program Operations Manual System
   (POMS) DI 24501.004, (May 5, 2015), https://secure.ssa.gov/
28  apps10/poms.nsf/lnx/0424501004.

                              7

1  which she took over-the-counter sleeping pills, was hospitalized
2  for three days, and jumped out a second-floor window to escape.
3  (Id.)  As for psychosocial history, Plaintiff reported that her
4  mother's boyfriend molested her at age nine, and she was raped at
5  age 14 and kidnapped.  (AR 322.)  She was in and out of juvenile
6  hall from age 14 to 18 and was in custody several times as an
7  adult.  (Id.)  She was on probation at the time of the 2011
8  assessment.  (Id.)

9       Evaluators found impaired intellectual functioning and
10 judgment and a below-average fund of knowledge.  (AR 323.)  Her
11 insight was severely impaired and her mood was irritable.  (Id.)
12 Her memory was unimpaired and her concentration intact.  (Id.)
13 As for behavioral disturbances, she was described as aggressive,
14 uncooperative, demanding, demeaning, belligerent, violent,
15 destructive, self-destructive, manipulative, and antisocial, and
16 she had poor impulse control and "excessive/inappropriate display
17 of anger."  (Id.)  The examiner added the notation, "antisocial
18 and dangerous."  (Id.)  Her principal diagnosis was antisocial
19 and borderline personality disorders, with a secondary diagnosis
20 of mood disorder not specified and malingering.  (AR 324.)  The
21 examiner found her primary problems to be educational and
22 occupational and gave her a Global Assessment of Functioning
23 score of 60.[6]  (Id.)  He noted that she "likely wants SSI."  (AR

24

25       [6] GAF scores assess a person's overall psychological
26 functioning on a scale of 1 to 100.  See Diagnostic and
   Statistical Manual of Mental Disorders 32 (revised 4th ed. 2000).
27 A GAF score between 51 to 60 describes "moderate symptoms" or any
   moderate difficulty in social, occupational, or school
28                                            (continued...)

8

323.)

The few treatment notes in the record begin on October 31, 2012, and are largely illegible but appear to say that Plaintiff had stopped coming to appointments. (See AR 354.) She reported past use of crack cocaine but said she had been sober for three years as of October 2012. (Id.) The notes indicate that she needed medication and therapy, could not sleep, and was hearing voices. (Id.) She missed her November appointment, and her next visit was January 2, 2013. (AR 351-52.) She had been prescribed Lithium[7] and Abilify,[8] but poor medication compliance was noted.

---

[6] (...continued)
functioning. Garrison v. Colvin, 759 F.3d 995, 1023 n.4 (9th Cir. 2014). The Commissioner has declined to endorse GAF scores, Revised Medical Criteria for Evaluating Mental Disorders and Traumatic Brain Injury, 65 Fed. Reg. 50764-65 (Aug. 21, 2000) (codified at 20 C.F.R. pt. 404) (GAF score "does not have a direct correlation to the severity requirements in our mental disorders listings"), and the most recent edition of the DSM "dropped" the GAF scale, citing its lack of conceptual clarity and questionable psychological measurements in practice, DSM-V at 16 (5th ed. 2013). Because GAF scores continue to be included in claimant medical records, however, the Social Security Administration has clarified that they are "medical opinion evidence under 20 C.F.R. § . . . 416.927(a)(2) if they come from an acceptable medical source." Wellington v. Berryhill, 878 F.3d 867, 871 n.1 (9th Cir. 2017) (citation omitted).

[7] "Lithium is used as a mood stabilizer, and is indicated for the treatment of manic episodes and maintenance of bipolar disorder." See Lithium carbonate, U.S. Nat'l Libr. of Med., https://pubchem.ncbi.nlm.nih.gov/compound/Lithium-carbonate (last visited Apr. 13, 2020).

[8] Abilify is the brand name for aripiprazole and "is indicated for manic and mixed episodes associated with bipolar I disorder, irritability associated with autism spectrum disorder, . . . and as an adjunctive treatment of major depressive disorder." See Aripiprazole, U.S. Nat'l Libr. of Med.,
(continued...)

9

(AR 351.)  On January 30, 2013, Plaintiff complained of seeing flashes and hearing dead people talking to her, as well as mood swings and depression.  (AR 350.)  Because she said Abilify made her hyperactive and restless, it was discontinued and she was prescribed Risperidone.[9]  (Id.)  She missed appointments on November 14, 2012, March 20, June 26, and September 11, 2013, and February 5, 2014.  (See AR 325, 344-51.)

In progress notes from September 2013 to May 2014, she reported goals of taking her medications, staying sober, and using her coping skills.  (AR 325-32.)  She felt disbelieved by her psychiatrist about medication compliance.  (AR 329.)  As to cutting herself, she was "very aware of the intention to treat herself with care and that not-cutting will express that intention."  (Id.)  During this period, she made "some progress" in employing coping skills and appeared to be "sharing more and allowing deeper discussion of barriers and coping."  (AR 329-32.)

b.  *Examiners and reviewers*

Dr. Simonian performed a complete psychiatric evaluation of Plaintiff on March 3, 2016.  (AR 355-60.)  She had not seen a psychiatrist for five months and was not taking medication because of "insurance problems."  (AR 356.)  She denied a history

---

[8] (...continued)
https://pubchem.ncbi.nlm.nih.gov/compound/60795#section=Drug-Indication (last visited Apr. 13, 2020).

[9] "Risperidone is indicated for the treatment of schizophrenia, acute manic or mixed episodes associated with Bipolar I Disorder, and irritability associated with autistic disorder."  See Risperidone, U.S. Nat'l Libr. of Med., https://pubchem.ncbi.nlm.nih.gov/compound/5073#section=Drug-and-Medication-Information (last visited Apr. 13, 2020).

of drug or alcohol abuse but had been psychiatrically
hospitalized several times.  (Id.)  Dr. Simonian found Plaintiff
"alert and oriented," with normal but rather fast speech.  (AR
357.)  Her mood was labile, described as normal but at times
irritable.  (Id.)  Her arms showed evidence of cutting.  (Id.)

Dr. Simonian diagnosed her with bipolar affective disorder
in partial remission, personality disorder not otherwise
specified with borderline personality features, and moderate
psychological stressors.  (AR 358.)  He gave her a GAF score of
50.[10]  (Id.)  He assessed her ability to understand simple one-
or two-step job instructions as "not limited."  (AR 359.)  He
found her "moderately limited" in her ability to follow detailed
and complex instructions, maintain concentration and attention
for a period of time, adapt to the stresses common to a normal
work environment, maintain regular attendance in the workplace
and perform work activities on a consistent basis, and perform
work activities without special or additional supervision.  (Id.)
He determined that her ability to "relate and interact with
supervisors, co-workers, and the public is markedly limited."
(Id.)

Dr. Mertens reviewed the record on May 12, 2016.  (AR 119-
27.)  He assessed her statements as "partially consistent" with
the file evidence and concluded that "[w]hile the evidence

_____

[10] A GAF score of 41 to 50 indicates "[s]erious symptoms
(e.g., suicidal ideation, severe obsessional rituals, frequent
shoplifting) OR any serious impairment in social, occupational,
or school functioning (e.g., no friends, unable to keep a job)."
Diagnostic and Statistical Manual of Mental Disorders 32 (revised
4th ed. 2000).

supports some functional limitations, it does not support complete inability to work." (AR 122.)

Dr. Mertens weighed Dr. Simonian's opinion and found that it was "grossly consistent" but "overestimate[d] marked limitation dealing [with] others." (Id.) He explained that she "clearly demonstrates distress, but interacts reasonably well during documented contacts"; he recommended limited social contact but found no "marked disab[ility]" in that area. (Id.)

He noted moderate limitation in most areas, including her ability to understand and remember detailed instructions, carry out detailed instructions, maintain attention and concentration for extended periods, work in coordination with or in proximity to others without being distracted by them, interact appropriately with the general public, accept instructions and respond appropriately to criticism from supervisors, and get along with coworkers or peers without distracting them or exhibiting behavioral extremes. (AR 123-24.) Dr. Mertens noted that an undated function report reflected that she was "personal care independent," prepared simple meals, and completed household chores. (AR 124; see AR 248-56.) She "walk[ed], use[d] public transportation, shop[ped], and manage[d] her own finances unassisted." (AR 124.) She did not like to spend time with others and required reminders for personal hygiene, medication management, and appointments. (Id.) She reported problems with memory, task completion, concentration, understanding, following instructions, and getting along with others. (Id.) She could follow spoken or written instructions, but her stress management was poor and she coped by cutting herself. (Id.) According to

12

Dr. Mertens:

> [A] preponderance of the evidence contained in [the] file suggests that [Plaintiff] is capable to meet the basic mental and emotional demands of competitive, renumerative, unskilled work, including the abilities to do the following on a sustained basis in a work setting with low social contact:
>
> > A.   Understand, remember, carry out at least simple instructions.
> >
> > B.   Make simple work related decisions and abide by a schedule.
> >
> > C.   Respond appropriately to supervisors, coworkers, and social interactions in a work setting with reduced social contact.
> >
> > D.   Deal with at least minor changes in work routines.

(AR 125.)

Dr. Tendler reviewed Plaintiff's file on July 25, 2016, and found medically determinable mental impairments of bipolar and personality disorder but "less than significant limitations." (AR 134; see AR 133-41.) He found Dr. Simonian's opinion "more limiting than warranted based on objective evidence in exam and reported functioning" and gave it "other than great weight." (AR 134.) He concluded that Plaintiff's impairments could reasonably be expected to produce some of the symptoms alleged, but her statements concerning the intensity, persistence, and limiting effects of those symptoms were only "partially consistent." (Id.)

13

He opined that she should not be expected to memorize or understand detailed instructions but could "understand, remember, and carry out a two-step command involving simple instructions." (AR 137.)  He explained that she could concentrate and maintain persistence on simple tasks and would be able to have "extended periods of concentration and attention greater than 2-4 hour segments."  (AR 138.)  She could "maintain attendance and complete a normal workweek and maintain pace with occasional absences."  (Id.)  As to social interaction, he found that she was "[s]ocially available for superficial interactions," could "tolerate the minimum social demands of simple-task settings," and was "[a]ble to relate to coworkers [and] supervisors but would have difficulty relating to the public on a regular basis." (Id.)  Finally, as to adaptation limitations, he explained that she could "maintain an acceptable level of attendance" and "adequately adapt to changes of routine, and to simple situations, not calling for rapid or extensive changes in work tasks or procedures."  (AR 139.)

## 2.   Applicable law

Three types of physicians may offer opinions in Social Security cases: those who directly treated the plaintiff, those who examined but did not treat the plaintiff, and those who did neither.  Lester, 81 F.3d at 830.  A treating physician's opinion is generally entitled to more weight than an examining physician's, and an examining physician's opinion is generally

1  entitled to more weight than a nonexamining physician's.[11]  Id.

2       When a treating or examining physician's opinion is not

3  contradicted by other evidence in the record, it may be rejected

4  only for a "clear and convincing" reason.  See Carmickle v.

5  Comm'r, Soc. Sec. Admin., 533 F.3d 1155, 1164 (9th Cir. 2008)

6  (quoting Lester, 81 F.3d at 830-31).  When a treating or

7  examining physician's opinion is contradicted, the ALJ must

8  provide only a "specific and legitimate reason" for discounting

9  it.  Id.  The weight given an examining physician's opinion,

10 moreover, depends on whether it is consistent with the record and

11 accompanied by adequate explanation, among other things.

12 § 416.927(c)(3)-(6).  Furthermore, "[t]he ALJ need not accept the

13 opinion of any physician . . . if that opinion is brief,

14 conclusory, and inadequately supported by clinical findings."

15 Thomas v. Barnhart, 278 F.3d 947, 957 (9th Cir. 2002); accord

16 Batson v. Comm'r of Soc. Sec. Admin., 359 F.3d 1190, 1195 (9th

17 Cir. 2004).

18      The Court must consider the ALJ's decision in the context of

19 "the entire record as a whole," and if the "'evidence is

20

21      [11] For claims filed on or after March 27, 2017, the rules in

22 § 416.920c (not § 416.927) apply.  See § 416.920c (evaluating
   opinion evidence for claims filed on or after Mar. 27, 2017).

23 The new regulations provide that the Social Security
   Administration "will not defer or give any specific evidentiary

24 weight, including controlling weight, to any medical opinion(s)
   or prior administrative medical finding(s), including those from

25 your medical sources."  § 416.920c(a).  Thus, the new regulations
   eliminate the term "treating source" as well as what is

26 customarily known as the treating-source or treating-physician
   rule.  See § 416.920c.  Plaintiff's claim was filed before March

27 27, 2017, and the Court therefore analyzes it under the treating-
   source rule in § 416.927.

28

1  susceptible to more than one rational interpretation,' the ALJ's
2  decision should be upheld." <u>Ryan v. Comm'r of Soc. Sec.</u>, 528
3  F.3d 1194, 1198 (9th Cir. 2008) (citation omitted).

4        3.  <u>Analysis</u>

5        The ALJ gave "great weight" to the opinions of Drs. Simonian
6  and Tendler and "moderate weight" to Dr. Mertens's.  (AR 21-23.)
7  An ALJ is tasked with "resolv[ing] conflicts in the testimony"
8  and "ambiguities in the record."  <u>Treichler v. Comm'r of Soc.</u>
9  <u>Sec. Admin.</u>, 775 F.3d 1090, 1098 (9th Cir. 2014).  Nevertheless,
10  the ALJ here gave no explanation for apparently crediting only
11  part of Dr. Simonian's opinion and did not reconcile the
12  differences between the two opinions to which he gave "great
13  weight."  <u>See</u> <u>Nguyen v. Chater</u>, 100 F.3d 1462, 1464 (9th Cir.
14  1996) (ALJ erred when he did not explicitly reject examining
15  psychologist's opinion or set forth specific, legitimate reasons
16  for crediting nonexamining psychologist's opinion over his).

17              a.  *The ALJ erred in assessing Dr. Simonian's*
18                  *opinion*

19        The ALJ attributed "great weight" to the opinions of Drs.
20  Simonian and Tendler, finding them "supported with explanation"
21  and "both internally consistent and consistent with the record as
22  a whole."  (AR 22, 23.)  As to Plaintiff's ability to relate to
23  and interact with supervisors, coworkers, and the public, Dr.
24  Simonian opined that she was "markedly limited" (AR 359), and Dr.
25  Tendler believed that she was "[s]ocially available for
26  superficial interactions," could "tolerate the minimum social
27  demands of simple-task settings," and was "[a]ble to relate to
28  coworkers [and] supervisors but would have difficulty relating to

16

1  the public on a regular basis" (AR 138).

2       Dr. Tendler, who reviewed the record on reconsideration,
3  found Dr. Simonian's psychiatric report "more limiting than
4  warranted based on objective evidence in exam and reported
5  functioning or [activities of daily living]."  (AR 134.)  Thus,
6  Dr. Tendler gave Dr. Simonian's report "other than great weight"
7  and concluded that "[w]hile the evidence supports some functional
8  limitations, it does not support complete inability to work."
9  (AR 134, 136.)

10      The ALJ appears to have adopted Dr. Tendler's opinion over
11 Dr. Simonian's on this issue because he limited Plaintiff to no
12 interaction with the public but occasional contact with coworkers
13 and supervisors.  (AR 20.)  But he did not expressly resolve this
14 obvious conflict, nor did he provide a "specific and legitimate
15 reason" for implicitly discounting Dr. Simonian's finding of
16 "marked limitation" as to Plaintiff's interaction with coworkers
17 and supervisors.  See Carmickle, 533 F.3d at 1164 (ALJ must give
18 "specific and legitimate reason" for discounting contradicted
19 examining physician's opinion).  This was error:

20      [When] an ALJ does not explicitly reject a medical
21      opinion or set forth specific, legitimate reasons for
22      crediting one medical opinion over another, he errs. In
23      other words, an ALJ errs when he rejects a medical
24      opinion . . . while doing nothing more than ignoring it.
25 Garrison v. Colvin, 759 F.3d 995, 1012-13 (9th Cir. 2014)
26 (citation omitted).

27      The ALJ's failure to resolve the conflict was not harmless.
28 The RFC did not take into account Dr. Simonian's finding that

17

Plaintiff was essentially unable to interact with coworkers and supervisors.  See Denby v. Colvin, No. 1:15-CV-00191-SB, 2016 WL 917313, at *4, *13 (D. Ore. Mar. 8, 2016) (noting that crediting doctor's opinion of "marked limitations" in interacting with supervisors, public, and coworkers and in responding appropriately to usual work situations would make claimant unable to work).  The ALJ provided no explanation for ignoring Dr. Simonian's "marked limitation" finding as to coworkers and supervisors even though he gave the opinion "great weight."  See Davis v. Colvin, No. 3:14-cv-00271-PK., 2015 WL 2218386, at *8, *10 (D. Ore. May 9, 2015) (remanding because ALJ failed to provide "detailed explanation" of implicit rejection of limitations in doctors' opinions despite giving them substantial weight); see also Embrey v. Bowen, 849 F.2d 418, 421-22 (9th Cir. 1988) (remanding when ALJ failed to provide "detailed, reasoned and legitimate rationales" for disregarding physician's finding). Indeed, the vocational expert testified that if Plaintiff could not interact with "supervisors, coworkers or the public," she couldn't work at all.  (AR 52.)  Accordingly, the ALJ's error was not harmless and reversal is necessary.

                    b.  *The VE hypothetical was likely proper*

     Citing almost exclusively law from the Seventh Circuit, Plaintiff contends that the ALJ failed to ask the vocational expert about her difficulties in maintaining concentration, persistence, and pace.  (J. Stip. at 4-5.)  Because the ALJ's hypothetical included the functional limitations in his RFC finding and specified "1-2 step tasks" at "reasoning level 1," it properly accounted for Plaintiff's limitations in that area.  (AR

                                    18

20; see AR 48-51); see Thomas, 278 F.3d at 956 (when hypothetical
includes all of claimant's credible functional limitations, ALJ
is generally entitled to rely on VE's response).

At step five, the Commissioner has the burden of showing the
existence of work in the national economy that a plaintiff can
perform, taking into account her age, education, and vocational
background.  See Pinto v. Massanari, 249 F.3d 840, 844 (9th Cir.
2001).  To meet this burden, the ALJ must "identify specific jobs
existing in substantial numbers in the national economy that
claimant can perform despite her identified limitations."
Johnson v. Shalala, 60 F.3d 1428, 1432 (9th Cir. 1995).  The ALJ
first assesses the claimant's RFC, then considers potential
occupations the claimant may be able to perform, usually relying
on the Dictionary of Occupational Titles or a VE's testimony.
See Gutierrez v. Colvin, 844 F.3d 804, 806-07 (9th Cir. 2016)
(ALJ may rely on VE to provide testimony about jobs applicant can
perform despite her limitations, using DOT to guide analysis).

An "ALJ's assessment of a claimant adequately captures
restrictions related to concentration, persistence, or pace where
the assessment is consistent with restrictions identified in the
medical testimony."  Stubbs-Danielson v. Astrue, 539 F.3d 1169,
1174 (9th Cir. 2008) (citations omitted).  Here, the ALJ posed to
the VE a hypothetical individual of Plaintiff's age and education
who was limited to one- or two-step tasks at reasoning level one,
with no public contact but occasional contact with supervisors
and coworkers.  (AR 48-51.)  This hypothetical was consistent
with her RFC, which included "perform[ing] work consisting of
simple 1-2 step tasks at reasoning level 1; can have no public

19

contact; and can have occasional contact with supervisors and coworkers." (AR 20.)

Drs. Tendler and Mertens found Plaintiff "not significantly limited" in the ability to carry out short and simple instructions; perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerance; sustain an ordinary routine without special supervision; and make simple work-related decisions. (See AR 123, 137-38.) Both doctors found her "moderately limited" in her ability to carry out detailed instructions, maintain attention and concentration for extended periods, work in coordination with or in proximity to others without being distracted by them, complete a normal workday and workweek without interruptions from psychologically based symptoms, and perform at a consistent pace without an unreasonable number or length of rest periods. (Id.) Dr. Simonian also found her "moderately limited" in her ability to do detailed and complex instructions, maintain concentration and attention for a period of time, adapt to the stresses common to a normal work environment, maintain regular attendance in the workplace and perform work activities on a consistent basis, and perform work activities without special or additional supervision. (AR 359.) He found her ability to remember, understand, and carry out simple one- or two-step instructions "not limited." (Id.)

The ALJ properly translated these limitations, including concerning concentration, persistence, and pace, into a concrete restriction to "simple 1-2 step tasks at reasoning level 1." (AR 20); see also Stubbs-Danielson, 539 F.3d at 1173-74 (ALJ's

limitation to "simple, routine, repetitive" work sufficiently accommodated medical-opinion evidence that claimant had "moderate" limitation in pace and "other mental limitations regarding attention, concentration, and adaption"); <u>Phillips v. Colvin</u>, 61 F. Supp. 3d 925, 940 (N.D. Cal. 2014) (ALJ properly assessed medical evidence in determining that despite moderate difficulties in concentration, persistence, or pace, claimant could perform "simple routine 1-2 step unskilled tasks").

Again citing only Seventh Circuit law, Plaintiff also complains that the ALJ "failed to provide any analysis" of "allowable time off-task in a competitive job." (J. Stip. at 5.) The ALJ asked the VE whether someone who would be absent from work an average of more than two days a month because of a psychiatric condition or "off task at least 15% of the workday" would be precluded from work, and the VE responded that those were "beyond acceptable thresholds." (AR 51.) But the ALJ did not include any such finding in the RFC. (<u>See</u> AR 20.) Nor were such findings supported by the medical evidence. Drs. Simonian, Tendler, and Mertens found Plaintiff "moderately limited" in her ability to "maintain regular attendance in the workplace" or complete a normal "workday and workweek without interruptions from psychologically based symptoms." (AR 123, 137-38, 359.) To the extent it is unclear whether those findings translate to more than two absences a month or being off task 15 percent or more of the time, on remand the ALJ can reconsider the issue. <u>See</u> <u>Ajani v. Comm'r of Soc. Sec.</u>, No. 18-cv-02226-SI, 2019 WL 2106232, at *15 (N.D. Cal. May 14, 2019) (finding that claimant would be barred from any job when he would miss three days monthly in

21

1  winter because of asthma and arthritis and two days monthly rest
2  of year).

3       B.   Remand for Further Proceedings Is Appropriate

4       When, as here, an ALJ errs, the Court generally has
5  discretion to remand for further proceedings.  See Harman v.
6  Apfel, 211 F.3d 1172, 1175-78 (9th Cir. 2000).  Under the
7  "credit-as-true" rule, a court may direct an immediate award of
8  benefits.  See id. at 1179 ("[T]he decision of whether to remand
9  for further proceedings turns upon the likely utility of such
10 proceedings."); see also Garrison, 759 F.3d at 1019-20.  When the
11 ALJ's findings are so "insufficient" that the Court cannot
12 determine whether the rejected testimony should be credited as
13 true, however, the Court has "some flexibility" in applying the
14 credit-as-true rule.  Connett v. Barnhart, 340 F.3d 871, 876 (9th
15 Cir. 2003); see also Garrison, 759 F.3d at 1020 (noting that
16 Connett cautioned that credit-as-true rule may not be dispositive
17 in all cases).  This flexibility should be exercised "when the
18 record as a whole creates serious doubt as to whether the
19 claimant is, in fact, disabled within the meaning of the Social
20 Security Act."  Garrison, 759 F.3d at 1021.

21      Here, under Connett, remand for further proceedings is
22 appropriate.  As discussed, the ALJ failed to fully explain his
23 decision, and further administrative proceedings will allow him
24 to do so.  Moreover, as discussed, other doctors found Plaintiff
25 not as limited as Dr. Simonian did.  On remand, the ALJ should
26 resolve the conflict in the record concerning Plaintiff's ability
27 to interact with coworkers and supervisors.  Because reversal is
28 warranted on this ground, the Court does not decide whether

Plaintiff's subjective symptom statements were consistent with the record.  That should be reassessed on remand once the conflict in the doctors' opinions is resolved.

**VI.   CONCLUSION**

Consistent with the foregoing and under sentence four of 42 U.S.C. § 405(g),[12] IT IS ORDERED that judgment be entered REVERSING the Commissioner's decision, GRANTING Plaintiff's request for remand, and REMANDING this action for further proceedings consistent with this Memorandum Decision.


DATED: April 15, 2020

JEAN ROSENBLUTH
U.S. Magistrate Judge

---

[12] That sentence provides: "The [district] court shall have power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing."